**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RUSSELL AMOS, JR., M22426,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 17 C 7516** |
| | ) | |
| **JACQUELINE LASHBROOK, WARDEN,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Pro se Petitioner Russell Amos, Jr., an Illinois prisoner confined at the Menard Correctional Center, has brought a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On April 15, 2009, Amos forcibly entered the home of his victim, and sexually assaulted her with his penis and with the baseball bat she was carrying for protection against him. Amos was convicted on two counts of aggravated criminal sexual assault and one count of home invasion in the Circuit Court of Will County, Illinois and sentenced to three consecutive 30-year terms. The Third District Appellate Court vacated one of the aggravated criminal assault convictions, but otherwise affirmed Amos's conviction and sentence.

Amos's petition to this court seeks relief on a number of grounds, including ineffective assistance of counsel, an alleged violation of his Sixth Amendment Confrontation Clause rights, and an alleged violation of due process when the trial judge denied his request for a continuance. For the reasons explained below, the court concludes that Petitioner's claims are procedurally defaulted, are not cognizable in federal court, or are meritless. Accordingly, the petition is denied, but the court will issue a certificate of appealability on the Confrontation Clause claim.

## FACTUAL AND PROCEDURAL BACKGROUND

Absent clear and convincing evidence, on habeas review, the federal court presumes the factual findings made by state courts are correct. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). The following facts are derived from the Illinois Appellate

court's order affirming Petitioner Amos' conviction, in part, on direct appeal, as well as the record itself. *See* Rule 23 Order, *People v. Amos*, No. 3-11-0472, 2013 IL App (3d) 110472-U (3rd Dist. Ill. App. Ct. Apr. 10, 2013) (hereinafter "Direct Appeal Order.").

## I.    Pre-Trial

On April 15, 2009, Amos approached the victim from the back of her house and handed her a beer, which she drank on the porch. (*Id.* at 3-4.)  As the victim finished her beer and went inside, Petitioner "pushed his way into her home without permission, causing her to go to her bedroom to find her phone to call the police." (*Id.* at 4.)  When she did not find her phone in the bedroom, the victim "grabbed her baseball bat, and entered the kitchen to find her phone." (*Id.*) At this point, Petitioner "choked the victim until she blacked out," and, before she lost consciousness, Petitioner "removed her pants, inserted the baseball bat into her vagina and rectum, and he inserted his penis into her vagina." (*Id.*)

Amos was charged with two counts of home invasion and three counts of aggravated criminal sexual assault on April 30, 2009. (Direct Appeal Order at 2.)  Prior to trial, on January 27, 2011, the State moved *in limine* pursuant to 725 ILCS 5/115-7, also known as a "Rape Shield" law, to prohibit the introduction of evidence relating to the victim's prior sexual history or reputation.[1] (*Id.* at 2, 10.)  This motion was granted. (*Id.*)

On February 25, 2011, roughly a month before trial ((Report of Proceedings, Ex. K to St. Ct. R. (hereinafter "Report of Proceedings"), at 567), Petitioner filed a notice of intent to pursue a

---

[1]    This statute makes inadmissible "the prior sexual activity or the reputation of the alleged victim."  An exception to this bar is available if the defendant claims that the victim "consented to the sexual conduct with respect to which the offense is alleged."  Even under this exception, however, the trial court must first hold a hearing "to determine whether the defense has evidence to impeach the witness in the event that prior sexual activity with the defendant is denied."  For the exception to apply, there must be "reasonably specific information as to the date, time and place of the past sexual conduct between the alleged victim . . . and the defendant."  If the court does not find the information offered at this hearing reasonably specific, "counsel for the defendant shall be ordered to refrain from inquiring into prior sexual activity between the alleged victim . . . and the defendant."  725 ILCS 5/115-7.

consent defense, and asked the court to reconsider its prior ruling applying the Rape Shield law. (Direct Appeal Order at 3.) Petitioner aimed to present "reasonably specific information" regarding his past sexual contact with the victim, in order to qualify for the consent-based exception to the Rape Shield law, permitting admission of evidence regarding a past sexual relationship between Petitioner and the victim. (Report of Proceedings at 204-05.) *See also* 725 ILCS 5/115-7. At a hearing on this motion, Petitioner testified to an extensive past relationship with the victim, spanning 18 months, during two of which, he claimed, he and the victim were living together at the victim's house. (Direct Appeal Order at 3.) Petitioner claimed he stored a bag of his clothing at the victim's home even when not residing there. (Report of Proceedings at 273.) He also claimed, without providing specific dates, that he and the victim engaged in sexual intercourse more than 100 times at various locations. (Direct Appeal Order at 3.) The trial court found Petitioner's testimony inconsistent, not credible, and lacking in specificity. (*Id.* at 10.) Accordingly, the court ruled that it would consider allowing such evidence regarding the victim's sexual history only if the victim first acknowledged a past sexual history with Petitioner. (*Id.*) The court did permit Petitioner to assert a consent defense. (*Id.* at 3.)

Petitioner filed a second motion to reconsider, and a hearing was held on March 25, 2011. (Report of Proceedings at 292.) Two witnesses testified at this hearing. The first, Homer Williams, testified that he had seen Petitioner and the victim together more than ten times, "hugged up," and affectionate with one another, and that he was aware that the Petitioner spent the night at the victim's home in January or February 2009. (*Id.* at 319-322, 325.) Williams described their relationship as "kicking it," and confirmed that this meant they were dating. (*Id.* at 328, 329.) Williams's girlfriend gave a statement, as well, that Petitioner and the victim "were dating on and off" in early 2009. (*Id.* at 370.) The trial court granted the motion in part at this hearing, ruling that the defense would be permitted to "present to the jury that the defendant and victim had a prior dating relationship that included a prior sexual relationship, but there will be no indication where, how, when, type or anything like that." (Direct Appeal Order at 3.) The record reflects that

3

the order specifically permitted Petitioner to present to the jury that this "was not the sole time" that he and the victim had sexual contact. (Report of Proceedings at 370.)

## II.   Trial

A jury trial began on March 29, 2011. (Report of Proceedings at 567.) The victim was the first witness called. (*Id.* at 583.) As the appellate court noted, "the victim testified that she met [Petitioner] through an associate, but denied dating [Petitioner]." (Direct Appeal Order at 3-4.) The victim stated that on the night in question, April 15, 2009, the Petitioner approached her home from the back, "handed her a beer, and joined her on her porch." (*Id.* at 4.)[2] After the victim finished her beer, Petitioner pushed his way into her home without her permission. (*Id.*) As the victim, armed with a baseball bat, entered the kitchen to find her phone and make an emergency call, Petitioner overpowered her, choking her until she lost consciousness. (*Id.*) The victim testified that, before she blacked out, Petitioner sexually assaulted her, inserting his penis into her vagina and the bat into her vagina and rectum. (*Id.*) When she regained consciousness the following morning, confused to find herself on the floor, Petitioner was still present, "sitting on my couch," and "looking at me like I was dead." (Report of Proceedings at 604, 632.) The victim testified inconsistently about Petitioner's departure; she testified that he "ran out" when he heard a knock on the door (*id.* at 607), but also testified that he ran out while she was looking for her phone. (*Id.* at 635.) It is unclear who, if anyone, knocked; the victim testified that her son "came in shortly" after Petitioner fled. (*Id.*) After her son arrived, she called police and was transported to a hospital for treatment. (Direct Appeal Order at 4.)

At the conclusion of the victim's direct examination, the trial judge called a sidebar to remind defense counsel about the pre-trial ruling. As described above, the court's original ruling prohibited questions about the victim's past sexual history (unless she admitted to "prior sexual

---

[2]     It is unclear from the record, but the victim testified that Petitioner saw "a shadow coming from the back," presumably indicating the back yard. She was alerted to his presence by an automatic light sensor.

conduct" between the two, in which case the judge would re-address the issue). (Report of Proceedings at 280.) The judge later ruled that Petitioner would be permitted to present evidence "that this date of sexual relations or sexual contact between the defendant and the victim was not the sole time," but that there "will be no evidence presented before the jury relative to the extent . . . or the type of sexual relationship" between the two. (*Id.* at 373.) At trial, however, the judge required counsel to inquire whether the victim acknowledged a previous *dating* relationship before asking her whether there had been a previous *sexual* relationship between the two. (Direct Appeal Order at 11; Report of Proceedings at 647.) Defense counsel did not object to this instruction. (Direct Appeal Order at 11.) On cross-examination, the victim acknowledged that she knew Petitioner—she claimed their prior contact was limited to her having seen Petitioner at the home of an acquaintance and at a bar—but denied any dating relationship with him. (*Id.* at 3-4.) She also denied that Petitioner kept a bag of clothes at her house, and mentioned a prior break-in attempt by Petitioner in 2008.[3] *(Id.)*

The state presented other evidence in support of the charges. An emergency room technician who treated the victim noted tenderness in her cervix, rectum, and left temple (*id.* at 5), and then terminated the examination for safety reasons when he saw blood on the examination glove.[4] (Report of Proceedings at 665.) The technician gave an initial diagnosis of a "closed head injury" and "rectal injury" in addition to the tenderness. (*Id.* at 666.) Another witness, a radiologist, testified that computerized tomography ("CT") scans of the victim were consistent with

---

[3] The record appears inconsistent on to this point. The victim testified that she did not "recall" an incident with the defendant in 2008 during direct examination, but later testified that Petitioner "busted the window and climbed through the window" of her home in 2008. (Report of Proceedings at 591, 614-15.)

[4] The technician explained that "when there is blood on the examination glove, you do not do any further evaluation . . . [b]ecause if the patient has any perforation, your finger can go right into the abdomen and cause contamination." (Report of Proceedings at 665.)

insertion of an object into her rectum. (Direct Appeal Order at 5; Report of Proceedings at 760-65.)

To bolster Petitioner's claim that he and the victim had had a prior relationship, the defense called Homer Williams, who testified that he recalled seeing Petitioner and the victim together in the past, at least ten times. (Direct Appeal Order at 6.) The record is unclear on the timeframe of these instances, but Williams testified he had known the victim for around 20 years, and knew the Petitioner since grade school. (Report of Proceedings at 979, 1000.) Williams testified that he observed the Petitioner and victim hug and speak with one another. (Direct Appeal Order at 6.) He also testified that Petitioner had lived with the victim (*id.*), though the record is unclear as to when. Another individual, Norma Jean Simpson, testified that she grew up with the victim and that the victim herself introduced Simpson to Petitioner. (*Id.*) When asked whether the Petitioner and the victim had a "dating relationship," she confirmed that they had, offering no other details except that the two were on friendly terms. (*Id.*; Report of Proceedings at 954; Direct Appeal Order at 6.)

Prior to closing arguments, on March 31, 2011 (the third day of trial), Petitioner's trial counsel requested a continuance in order to call three additional witnesses. (*Id.* at 7; Report of Proceedings at 921.). Of the three, two are relevant for purposes of this petition: Detective Alan Vertin and Barbara Ward. (Direct Appeal Order at 7.) Vertin investigated the 2008 break-in, and the defense claimed he would testify that the Petitioner did indeed keep a bag of clothes in the victim's home. (*Id.*) Ward was a 25-year acquaintance of the victim, and the defense claimed she would testify that she had seen Petitioner and the victim together on many occasions, and that they had a previous dating and sexual relationship. (*Id.*) Defense counsel explained that Petitioner did not inform him about Ward until Petitioner saw her in the courthouse earlier that morning. (*Id.*) The record is unclear as to whether Ward remained in the courthouse at the time counsel sought to call her, nor how easy or difficult it may have been to bring her to the courtroom; defense counsel mentioned only that Ward had been interviewed, but counsel had not received

the investigator's report at the time of the motion. (Report of Proceedings at 1022.) The trial judge denied the continuance, concluding that Vertin's testimony was collateral and that Petitioner's failure to locate and call Ward during the two years the case was pending reflected a lack of diligence. (Report of Proceedings at 1021, 1022-25.)

Deliberations began on April 1, 2011, at 12:20 p.m. (*Id.* at 1164.) During the deliberation process, the jury sent four notes to the judge concerning their progress. (*See* Pet.'s Postconviction Pet. for Leave to Appeal, Ex. H to St. Ct. R. (hereinafter "Pet.'s Postconviction PLA"), at 22-25; Common Law Record, Ex. I to St. Ct. R. at 337-340.)[5] In the first note, received at 3:20 p.m., jurors notified the court they were "having difficulties" reaching a unanimous verdict on "a few counts." (Pet.'s Postconviction PLA at 22; Report of Proceedings at 1164.) At 4:00 p.m., the jury sent a second note stating that two jurors were "confident that they will not be swayed." (Pet.'s Postconviction PLA at 23; Report of Proceedings at 1168.) On receipt of these first two notes, the judge announced the contents to both the prosecution and defense, and proposed a reply: that the jury had received the judge's instructions and should continue to deliberate. (Report of Proceedings at 1164, 1168-69.) Neither side objected, and the instructions were given in a written reply. (*Id.*)

In a third note, received at around 5:15 p.m., the jurors reiterated they were confident they would not reach a unanimous verdict on two of the five counts. (Pet.'s Postconviction PLA at 25; Report of Proceedings at 1169-70.) This time, in lieu of a written reply, the judge proposed a "*Prim*" instruction. *See People v. Prim*, 53 Ill. 2d 62, 75-76, 289 N.E.2d 601, 609 (1972) (approving an instruction to a deadlocked jury that they should continue to deliberate, "examin[ing] the question submitted with proper regard and deference to the opinions of each other and . . . listen

---

[5]     The notes appear to be presented out of order in the Common Law Record, Ex. I to St. Ct. R. when compared against the Report of Proceedings. Petitioner does not challenge the court's responses to other notes from jury in which they asked to see the bat at issue and the indictment. (*See* Report of Proceedings at 1154, 1165.)

to each other's opinions . . . ." ).[6]  The parties approved this proposal, and the court called the jury to court and read the agreed instruction to them.  (Report of Proceedings at 1170-1173.)  In a final note, received at around 6:30 p.m., the jurors reported that they could not "reach a unanimous decision on two of the 5 counts."  (Pet.'s Postconviction PLA at 24; Report of Proceedings at 1174.)  After consultation with counsel, the judge called the jury in for its verdict.  The jurors found Petitioner guilty on one count of home invasion and two counts of aggravated criminal sexual assault.  (Direct Appeal Order at 7.)  The jury did not reach a verdict on additional counts of sexual assault and criminal sexual assault.  (Report of Proceedings at 1177-1181.)

III.    **Post-Trial and Appeal**

Petitioner filed *pro* se post-trial motions seeking to set aside the verdict due to ineffective assistance of counsel.  He argued specifically that counsel was ineffective for failure to procure phone records, failure to call various witnesses, failure to file motions on Petitioner's behalf, and failure to consult with the Petitioner.  (Direct Appeal Order at 7).  The trial court denied these motions, noting the court's own observations of defense counsel's diligence and preparedness, and pointing out that deciding which motions to file is a matter of trial strategy, not a basis for an ineffective assistance challenge.  (*Id.* at 7-8.)  Petitioner was sentenced to three consecutive terms of 30 years each.  (*Id.* at 8.)

Petitioner appealed through counsel appointed by the State Appellate Defender, challenging the court's refusal to grant a continuance in order for the defense to call Ward and Vertin as witnesses; the court's ruling prohibiting cross-examination of the victim concerning her sexual history with Petitioner; and the trial court's rejection of Petitioner's post-trial ineffective-assistance-of-counsel claim.  Petitioner argued further that his conviction on two counts of criminal sexual assault violated the "one-act, one-crime" principle.  (Pet.'s Direct Appeal Br., Ex. A to St.

_____

[6]    The *Prim* instruction appears to be akin to one given to deadlocked jurors in federal court and referred to as a "*Silvern* instruction."  *See United States v. Silvern*, 494 F.2d 355, 358 (7th Cir. 1973); Pattern Criminal Jury Instructions Seventh Circuit 7.03 (2017).

Ct. R. (hereinafter "Pet.'s Dir. Appeal Br."), at 2-3.)  The state conceded the last claim, and one of the counts of sexual assault was vacated.  (Direct Appeal Order at 14.)

The appellate court rejected the three other claims.  (*Id.* at 1.)  It upheld the refusal to allow a continuance on the basis that during the lengthy pre-trial and trial proceedings, Petitioner did not alert counsel to the existence of these witnesses.  (*Id.* at 9.)  The court observed, further, that Ward's testimony would merely have repeated evidence that impeached the victim's denial of a previous dating relationship with Petitioner; it would not have shed light on the question of whether she consented on the night at issue.  (*Id.*)  In addition, the appellate court agreed with the trial court that Vertin's testimony regarding the 2008 incident was collateral to the defendant's consent defense.  (*Id.*)  Accordingly, these witnesses would not have bolstered Petitioner's defense in a meaningful way, and the trial court did not abuse its discretion in denying a continuance.  (*Id.* at 9-10.)

The appellate court also rejected Petitioner's claims surrounding cross-examination of the victim.  (*Id.* at 12.)  Without specifically distinguishing a prior sexual relationship from a prior "dating" relationship, the Appellate Court concluded the trial court properly balanced Petitioner's Sixth Amendment rights against the policy goals of the Rape Shield law:  the court noted that Petitioner remained able to cross-examine the victim on other issues in her testimony, including her prior (nonsexual) interactions with Petitioner.  (*Id.*)  The court noted that Petitioner was able to cast doubt upon the victim's credibility in other ways, specifically Williams and Simpson's testimony rebutting her denial that she had a prior dating relationship with Petitioner.

Last, the appellate court affirmed the trial court's rejection of Petitioner's initial ineffective assistance claim, agreeing that the decisions concerning which witnesses to call and which motions to pursue are matters of trial strategy, and would not support an ineffective assistance claim.  (*Id.* at 14.)  The appellate court also ruled that the trial court properly relied on its own experience with defense counsel in rejecting this claim.  (*Id.*)

Petitioner sought leave to appeal this decision to the Supreme Court of Illinois, but leave was denied. *See* Petition for Leave to Appeal, *People v. Amos,* No. 116232, 996 N.E.3d 16 (Ill. 2013) (Table) ("PLA"). Petitioner then filed two post-conviction petitions. The first alleged ineffective assistance of counsel; specifically, Petitioner argued that his trial counsel should have called expert witnesses, interviewed and subpoenaed witnesses, and asserted a *Brady* claim regarding destroyed evidence. *See* Rule 23 Order, *People v. Amos*, No. 9-CF-880 (3rd Dist. Ill. App. Ct. June 28, 2016) hereinafter ("Postconviction Appeal Order"), at 2. The trial court rejected these claims as "merely conclusory allegations," noting that Petitioner did not point to any evidence that should have been used, identify witnesses should have been subpoenaed, or explain why an expert witness would have been useful, nor could he identify any specific evidence that had been destroyed. *Id.* at 3. In a second petition, Petitioner challenged the notes that the trial judge had exchanged with the jurors as "*ex parte* communications." *Id.* at 2. That petition, too, was rejected. The trial court struck the second petition because it was not served on the state, and the appellate court affirmed on different grounds: it noted that the second petition was filed without the leave required by the Post-Conviction Hearing Act (725 ILCS 5122-1(f)). *Id.* at 3-4. In that ruling, the appellate court granted the State Appellate Defender's motion for leave to withdraw. *Id.* at 4. The Supreme Court of Illinois again denied leave to appeal on November 23, 2016. *See Amos*, No. 121403, 65 N.E.3d 843 (Ill. 2016) (Table).

Petitioner then filed this timely § 2254 petition on October 17, 2017, raising a number of claims. (Petition for Writ of Habeas Corpus [1] (hereinafter "Habeas Pet."); Response to Habeas Corpus Petition (hereinafter "Response"), at 3.) This court will review the claims in a manner that gives "fair and meaningful consideration" to any plausibly raised claim, *Matzker v. Herr*, 748 F.2d 1142, 1146 (7th Cir.1984), and will review such filings liberally. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Petitioner asserts the following claims:

1. Ineffective assistance of trial counsel, specifically counsel's failure to object to the destruction of evidence, failure to conduct adequate "pre-trial

investigation," and failure to object to the judge's notes to the jury (Habeas Pet. at 5, 19, 26);

2.      Ineffective assistance of counsel on direct appeal for failing to make these same challenges (*Id.* at 5);

3.      Ineffective assistance of appellate counsel in postconviction proceedings, specifically that appellate counsel "failed to seek due process claims" (*id*);

4.      The court's notes to the jury violated Petitioner's constitutional rights (*id.* at 5, 38-45);

5.      Unspecified new evidence of actual innocence (*id.* at 5-6);

6.      Claims of prosecutorial misconduct, including allegations of vindictive prosecution, withholding of evidence, destruction of evidence, and the use of perjured testimony (*id.* at 18, 19, 26, 27);

7.      Judicial bias (*id.* at 26);

8.      Insufficiency of evidence, specifically that because there was evidence that the victim's home was Petitioner's "own dwelling," the evidence was insufficient to support a conviction on the home invasion charge (*id.* at 28-9);

9.      Error in the trial court's inquiry into ineffectiveness of counsel, specifically because the court relied on its observations and did not question defense counsel (*id.* at 32);

10.    The trial court's refusal to grant a continuance to allow additional witnesses violated Petitioner's constitutional rights (*id.*);

11.    The trial court's ruling prohibiting Petitioner from questioning the victim about their past sexual relationship violated Petitioner's Sixth Amendment Confrontation Clause rights. (*Id.*)

Respondent filed an answer, urging that Claim Six and parts of Claim One were too vague to permit a response; that Claims Two, Four Seven, Eight, and parts of Claim One (relating to the notes between the judge and jury) are procedurally defaulted as they have not been through a complete round of state review; that Claims Three, Five, and Nine are not cognizable as federal habeas claims; and that Claims Ten and Eleven are barred by the statutory language of 28 U.S.C. § 2254(d). (*See* Response at 4-8).

This court agrees that none of the claims are valid. Respondent correctly identifies grounds for dismissal of some claims, and the remainder are denied on additional or alternative grounds.

## DISCUSSION

**I.      Standard of Review and Procedural Requirements**

§ 2254 of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") makes clear that a federal court may grant a writ of habeas corpus to a petitioner in custody pursuant to a state court judgment "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This court will intervene only if there has been a violation of the petitioner's federal rights; "[e]rrors of state law in and of themselves are not cognizable on habeas review." *Perruquet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004). A federal court may grant a writ of habeas corpus only if the state court's decision "(1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *see also Richardson v. Lemke*, 745 F.3d 258, 273 (7th Cir. 2014).

In evaluating the state court's rulings, the federal court adopts a "highly deferential standard." *See Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). The state courts are "given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). *See also, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 389 (2000) (interpreting § 2254(d)(1) as mandating "federal courts to attend to every state-court judgment with utmost care."); *Henderson v. Briley*, 354 F.3d 907, 909 (7th Cir. 2004) (reiterating the highly deferential standard for review of state court rulings).

Further, federal courts cannot consider habeas claims that are "procedurally defaulted." *See, e.g., Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014). Critical to this is the exhaustion of claims in state court *before* habeas review. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Bolton v. Akpore*, 730 F.3d 685, 694 (7th Cir. 2013) ("The AEDPA requires state prisoners seeking a federal

writ of habeas corpus to exhaust available state remedies."). The exhaustion requirement's goal is to provide the State with an opportunity to correct the alleged violation. *See, e.g.*, *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013) ("The exhaustion requirement's primary purpose is to alert[] the state to the problem and invit[e] corrective action.") (citations omitted).

A claim is in procedural default if the petitioner failed to present the claims through at least one complete round of state-court review, either on direct appeal or in post-conviction proceedings. *See, e.g., Richardson*, 745 F.3d at 272. In determining whether a claim has been through a full round of state review, the court construes *pro se* petitions liberally, *see, e.g., Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th Cir. 2014), but requires habeas petitioners to pursue all available outlets for state review, including discretionary review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (announcing a rule "requiring state prisoners to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); *Richardson*, 745 F.3d at 268 (mandating that petitioners "raise the issue at each and every level in the state court system, including levels at which review is discretionary."). In general, the court will excuse procedural default only if a petitioner can demonstrate (1) "cause for and prejudice from the default," or (2) "a fundamental miscarriage of justice." *Richardson*, 745 F.3d at 272.

## II. Petitioner's Claims

Each of Petitioner's eleven claims is addressed in turn below.

### A. Claim One: Ineffective Assistance of Trial Counsel

Petitioner claims his trial counsel was ineffective for failing to object to the destruction of evidence, for failing to conduct an adequate "pre-trial investigation," and for failing to object to notes sent to the jury by the judge. (Habeas Pet. at 5, 19, 26.)

This claim is insufficient on its face to merit relief. A petitioner arguing that counsel was ineffective for failure to conduct an adequate pre-trial investigation must provide "sufficiently precise information, that is, a comprehensive showing, as to what the investigation would have

produced." *Richardson v. United States*, 379 F.3d 485, 488 (7th Cir. 2004) (citing *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003) (internal quotations and citations omitted)). *See also United States ex rel. Partee v. Lane,* 926 F.2d 694, 701 (7th Cir. 1991) ("a habeas court cannot even begin to apply *Strickland*'s standards to such a claim unless and until the petitioner makes a specific, affirmative showing as to what the missing evidence or testimony would have been.") (internal quotations and citations omitted); *United States v. Ashimi*, 932 F.2d 643, 649 (7th Cir. 1991) ([the court] must know what the attorney would have discovered after 'adequate' investigation.").

Petitioner here has made a conclusory claim that counsel was ineffective, but has not explained what his counsel failed to discover due to allegedly inadequate investigation. (Habeas Pet. at 19.) Without specificity as to what counsel would have uncovered with a "reasonable" pre-trial investigation, this court "cannot even begin to apply *Strickland*'s standard" regarding ineffectiveness of counsel.[7] *Lane,* 926 F.2d at 701.

Petitioner did offer more specifics in his direct-appeal brief and first petition for leave to appeal. (Pet.'s Dir. Appeal Br. at 36-38; Pet's Direct Appeal Pet. For Leave to Appeal, Ex. D to St. Ct. R. at 1-4.) Even if the court considers those specifics, however, his claim fails.[8] Petitioner's direct appeal focused on a failure to obtain telephone records and witnesses, both of which would relate to Petitioner's claim of an ongoing relationship with the victim. (*See* Pet.'s Dir. Appeal Br. at 36-38.) Yet this point was already made in court through the testimony of Simpson and Williams. (*See* Direct Appeal Order at 6.) Further, the victim did not debate that she knew

---

[7] To the extent that Petitioner has distinguished his claim of ineffective assistance (Claim One in this petition) from his claim that the trial court erred in rejecting that claim (Claim Nine), the ineffective assistance claim may be procedurally defaulted, but because Claim One fails on its merits, the court need not address this matter further.

[8] To be clear, Petitioner's failure to include specific details in *this* petition is sufficient to dismiss the claim on its merits. The analysis of the grounds Petitioner presented to the appellate court are included for completeness only.

Petitioner.  (*See* Report of Proceedings at 590-91; 617-19).  Petitioner has not shown that the phone records would have established something more, but even if he had, the fact that he and the victim were involved in a prior relationship, sexual or otherwise, would not establish that she consented to a violent assault.[9]

Petitioner faces a similar specificity issue regarding his allegation of destruction of evidence.  As Respondent notes, this claim is unduly vague.  (Response at 5-6.)  Petitioner claims only that "the State destroyed material evidence that possessed an exculpatory value."  (Habeas Pet. at 19.)  The specific type of evidence, and its exculpatory value, is not described in the petition or otherwise identified for the court.  The Rules Governing Section 2254 2(c) require the petition to "state the facts supporting each ground."  *See also Mayle v. Felix*, 545 U.S. 644, 655 (2005) (explaining that habeas petitioners must "plead with particularity").  That test is not met with respect to this claim.

There are procedural grounds for rejection of the ineffective assistance claims with respect to destruction of evidence (and with respect to Petitioners' arguments concerning the jury notes, a matter addressed on the merits below), as well.  Petitioner raised these issues in his *second* pro se post-conviction appeal filing, but that filing was stricken because Petitioner did not request leave to make a second filing, as required by the court's rules. (*See* Postconviction Appeal Order at 3-4.)  When a state court resolves a federal claim by relying on a state law ground that is both independent of the federal question and adequate to support the judgment, federal habeas review is foreclosed.  *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729; *Woods v. Schwartz*, 589 F.3d 368, 373 (7th Cir. 2009).  Importantly, the state law ground relied upon can be procedural, in which case the claims are "commonly referred to as being procedurally defaulted."  *Woods*, 589 F.3d at 373.  Thus, when a state court refuses to reach the merits of a petitioner's federal claims

---

[9] To the extent his argument is construed as a challenge to the constitutional validity of the Rape Shield law itself, the court addresses this issue below.

because they were not raised in accord with the state's procedural rules, that decision rests on independent and adequate state procedural grounds, resulting in a procedural default.  *See Id.; Gray v Hardy*, 598 F.3d 324 329 (7th Cir. 2010); *Johnson v. Loftus*, 518 F.3d 453, 455 (7th Cir. 2008).  Put another way, "[a] state is entitled to treat as forfeited a proposition that was not presented in the right court, in the right way, and at the right time—as state rules define those courts, ways, and times."  *Szabo v. Walls*, 313 F.3d 392, 395 (7th Cir. 2002).

Here, Petitioner failed to request leave of the court for the filing that contained these claims, as required by the state's procedural rules.  (*See* Postconviction Appeal Order at 3-4.) The purpose of the exhaustion requirement is to ensure that state courts have an opportunity to hear and resolve all claims a petitioner may have *before* federal courts become involved.  *See, e.g.*, *Turley*, F.3d 729 at 649 ("The exhaustion requirement's primary purpose is to alert[] the state to the problem and invit[e] corrective action.") (citations omitted).  If, due to failure to follow state rules, the state cannot hear these claims, this purpose is not satisfied.  Accordingly, claims in Petitioner's successive filing were not exhausted and are procedurally defaulted.

Claim One is dismissed.

### B.    Claim Two: Ineffective Assistance of Appellate Counsel on Direct Appeal

Petitioner contends that his appellate counsel was ineffective, explaining only, "I was denied effective assistance of trial and appellate counsel whereas counsel failed to object to exculpatory evidence being destroyed," and failed to object to the court's communications with the jury.  (Habeas Pet. at 5.)  Appellate counsel could not, of course, object to trial rulings, but even construing this claim as a challenge to the failure to raise the issue on appeal, the claim fails.

As Respondent observes, Petitioner did not raise this claim through a complete round of state court review.  (Response at 6-7.)  He did not assert these claims on direct appeal or in its initial post-conviction petition; instead he presented them only in his second post-conviction petition, which was dismissed on procedural grounds, as described above.  (Postconviction

Appeal Order at 3-4. As § 2254(c) provides, "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." The record does not demonstrate that Petitioner's procedural default should be excused; and, as discussed below, claims of ineffective assistance fail on their merits. Claim Two is denied.

### C. Claim Three: Ineffective Assistance of Appellate Counsel on Collateral Proceedings

Petitioner argues that appellate counsel was ineffective in post-conviction proceedings (*see* Habeas Pet. at 5), but as Respondent correctly notes, this claim is not cognizable. (*See* Response at 7). Under § 2254(i), "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i). *See also Martel v. Clair*, 565 U.S. 648, 662 n.3 (2012) ("§ 2254(i) prohibits a court from granting substantive habeas relief on the basis of a lawyer's ineffectiveness in post-conviction proceedings."); *Oaks v. Pfister*, 863 F.3d 723, 726 (7th Cir. 2017) ("because 'a prisoner does not have a constitutional right to counsel in state post-conviction proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default.'") (quoting *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017)).

Further, the court notes that Petitioner has not made clear in his petition how, exactly, counsel was ineffective, besides the vague statement that counsel "failed to seek petitioner's due process claims." (Habeas Pet. at 5.) Claim Three is denied.

### D. Claim Four: Judge's Notes to the Jury Violated Petitioner's Constitutional Rights

Petitioner claims his constitutional rights were violated when, on two occasions, the trial judge sent notes to the jury instructing them to follow the initial instructions. (*See* Habeas Pet. at 5, 38-45.) Petitioner has not shown how any of these communications was improper, however.

As noted, there were four notes from the jury. In the first, the jury reported it was "having difficulties" finding a unanimous verdict on "a *few* counts." (Pet.'s Postconviction PLA at 22; Report of Proceedings at 1164) (emphasis added.) The judge replied, "You have received my instructions. Please continue to deliberate." (Pet.'s Postconviction PLA at 22; Report of Proceedings at 1164.) The second explained there were two individuals who were "confident that they will not be swayed" but did not say whether these individuals were holding out on all charges or just the "few counts" mentioned in the first note; the judge replied identically to the first note. (Pet.'s Postconviction PLA at 23; Report of Proceedings at 1167-68.) The third note notified the court that the jury was "confident we will not reach a decision on the *two outstanding* counts." (Pet.'s Postconviction PLA at 25; Report of Proceedings at 1169-70) (emphasis added.) At this point, the judge called the jury in and read the agreed-upon *Prim* instruction. (*See* Report of Proceedings at 1170-1173.) On receipt of a final note, stating that the jury "cannot reach a unanimous decision on two of the five counts," the judge returned the jurors to the courtroom for the verdicts on which they had agreed. (Pet.'s Postconviction PLA at 24; Report of Proceedings at 1174, 1178-79.)

As Respondent notes, Petitioner failed to present this claim on direct appeal (Response at 6-7), instead asserting it for the first time in the disallowed successive post-conviction motion. (*See* Postconviction Appeal Order at 2.) Accordingly, the claim is in procedural default, for failing to exhaust remedies available in state court "by any available procedure." 28 U.S.C. § 2254(c).

And, this claim, too, fails on its merits. Communications with a jury may well be coercive. See, e.g., *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (judge's statement in response to deadlocked jury that the jurors "have got to reach a decision in this case" was unduly coercive). But nothing about the trial judge's conduct in this case raises such concern. The judge fully informed both sides of all communications received, and obtained approval before replying (Report of Proceedings at 1164, 1167-68, 1169-70), presumably for the obvious reason that

instructing the jurors to follow previously-given instructions is innocuous. (*See* Pet.'s Postconviction PLA at 22; Report of Proceedings at 1164.)

The circumstances in this case confirm that Petitioner was not prejudiced by the judge's communications with the jury. The jurors convicted him of just three of the five charges on which they were deliberating. (Common Law Record, Ex. I to St. Ct. R. at 236-246; Report of Proceedings at 1178-79.) The jury notes never implied that there was indecision on all of the charges; they specifically mentioned only two. (Pet.'s Postconviction PLA at 24.) The fact that the jurors ultimately convicted Petitioner of three of the five charges is powerful evidence that they were not having difficulty with those counts. The record reflects a mistrial on exactly two charges: Count II (home invasion) and Count V (aggravated criminal sexual assault). (*See* Common Law Record, Ex. I to St. Ct. R. at 236, 239-240, 243-244; Report of Proceedings at 1177-1181.) Accordingly, it appears the judge's notes had no effect: the jury could not agree before the responses, nor could it agree after, and Petitioner was not convicted on the two charges at issue. There was no prejudice to Petitioner from the jury communications. Claim Four is denied.

### E. Claim Five: New Evidence shows Actual Innocence

Petitioner's claim that new evidence demonstrates his actual innocence is hopelessly vague. (*See* Habeas Pet. at 5-6.) Though he cites cases involving newly-discovered evidence (*see* Habeas Pet. at 20), Petitioner has identified no newly-discovered evidence in his own case. Because it is entirely clear what evidence this is, this claim offers no basis for relief. *See* Rules Governing Section 2254 2(c); *Mayle*, 545 U.S. at 655.

Moreover, as Respondent notes, this claim is not cognizable under federal habeas. (*See* Response at 7-8.) The Supreme Court has made clear that actual innocence claims have "never been held to state a ground for independent habeas relief absent an independent constitutional violation." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). As the Court has explained, an actual innocence claim serves merely as the "gateway" through which a Petitioner may overcome a procedural barrier to argue an underlying constitutional claim. *See Schlup v. Delo*, 513 U.S. 298,

316 (1995). *See also Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) ("Gomez is using actual innocence solely as a basis, or a gateway, for having his otherwise barred constitutional claims heard."). Petitioner has neither offered evidence of actual innocence, nor linked any such evidence to a constitutional violation. Claim Five is denied.

### F.    Claim Six: Prosecutorial Misconduct

Petitioner alleges various forms of prosecutorial misconduct, including "vindictive prosecution" under *Blackledge v. Perry*, 417 U.S. 21 (1974) (Habeas Pet. at 18); a *Brady* violation for failure to disclose evidence (*id.*); bad-faith destruction of evidence (*id.* at 18-19); other unspecified "prosecutorial misconduct" (*id.* at 26); and the use of perjured testimony. (*Id.* at 27.) Respondent contends that these claims, as well, are too vague (*see* Response at 5), and this court agrees. Petitioner is required by the habeas rules and Supreme Court precedent to offer specific, particularized facts in support of his claims. *See* Rules Governing Section 2254 2(c); *Mayle*, 545 U.S. at 655. Absent information on how the prosecution was vindictive, *what* evidence was destroyed and the impact on the trial, or what the perjured testimony was, the court cannot evaluate these claims. Claim Six is denied.

### G.    Claim Seven: Judicial Bias

Petitioner's claim of judicial bias (see Habeas Pet. at 26) is, as Respondent contends, procedurally defaulted, as it was not presented in Petitioner's state court appeals. (*See* Response at 6-7.) Judicial bias was not a stated issue in Petitioner's direct appeal (Pet.'s Dir. Appeal Br.), nor does it appear to have been explicitly raised in Petitioner's second PLA. (Pet.'s Postconviction PLA.) The record provides no basis to excuse the procedural default.

Even if there were, this court would dismiss this claim, too, on vagueness grounds. The Supreme Court has explained that a claim of judicial bias has merit only if there is a showing that the likelihood of bias on the part of the judge is "too high to be constitutionally tolerable." *Caperton v. A. T. Massey Coal Co.*, 556 U. S. 868, 872 (2009) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). A recent example is *Williams v. Pennsylvania*, where the chief justice who approved a

death sentence against the defendant was previously the district attorney who sought that same death penalty. 136 S. Ct. 1899, 1903 (2016). The court found this was "a significant, personal involvement" and "presented an unconstitutional risk of bias." *Id.* at 1907. Petitioner does not even make clear which decisions of the judge in this case were biased, and offers no hint that the judge had any personal involvement in the case. Claim Seven is denied.

### H. Claim Eight: Insufficient Evidence

Petitioner claims the evidence was insufficient to support the verdict, and appears to focus on the home invasion conviction: if the dwelling Petitioner entered was his own, he cannot have invaded it. (Habeas Pet. at 28-31.) Again, Respondent notes (Response at 6-7) that this claim is procedurally defaulted, as it was not raised on direct appeal (Pet.'s Dir. Appeal Br.) or in any post-conviction appeal filings. (Pet.'s Pro Se Postconviction Appeals and Filings and Related Orders, Ex. F to St. Ct. R.; Pet.'s Postconviction PLA.)

The court notes, in any event, that Petitioner offers no evidence to support the claim that the dwelling was his own. He contends he was "let inside" the dwelling by the victim (*id.* at 29), and refers to cell phone records and the cell phone signal. But he has not explained how those records would show that he was "let inside" as opposed to having forced his way in without permission. In the court's view, Petitioner's own language belies his claim: he claims he was "let" inside with permission of the victim, but presumably would not have needed permission to enter if the dwelling were his own. Claim Eight is denied.

### I. Claim Nine: Trial Court Error in its Post-Conviction Inquiry into Ineffectiveness of Counsel

Petitioner claims that the state trial court erred in its inquiry into his ineffectiveness of counsel claim, presumably on the same grounds mentioned in Petitioner's prior appeals: rather than requiring a showing from defense counsel, the trial court simply relied on its own observations of counsel's performance in rejecting this claim. (Pet.'s Dir. Appeal Br. at 2.) Whatever the merits of that approach, this court notes that Petitioner has presented no specifics

about what a more searching review of the defense might have unearthed. Any claim of general neglect or inadequate pre-trial investigation fails for the same reason that the underlying ineffective assistance claim fails: Plaintiff has offered no specifics about what defense counsel would have done, had counsel been more prudent. Further, as the Appellate Court properly noted, the filing of motions and calling of witnesses is a matter of trial strategy and are not grounds for an ineffective assistance of counsel claim. (Direct Appeal Order at 14.) Claim Nine is denied.

**J.      Claim Ten: Denial of Continuance was a Constitutional Violation**

At the end of the trial, Petitioner requested a continuance in order to call additional witnesses. He argues here that the trial court's denial of this request violated his rights. (*See* Habeas Pet. at 32.) The court presumes his claim is the same one he made on direct appeal: that the denial violated his "6th and 14th Amendment right to present a defense." (Pet.'s Dir. Appeal Br. at 16.) Respondent counters that the statutory language in § 2254(d)(1) bars this claim. (*See* Response at 4-5.) The court is less certain that § 2254(d)(1) dooms this claim, but concludes, as explained below, that it fails on its merits.

Under § 2254(d)(1), habeas relief shall not be granted unless a state court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Respondent claims that because "the Supreme Court has never held that the denial of a continuance to secure a witness violates the constitution," the claim is barred. (*Id.* at 4.)

This appears to be an overstatement of § 2254(d)(1) (and AEDPA through which it was enacted). In *Williams v. Taylor*, the Court made clear that the purpose of § 2254(d)(1) was to set the standard of review for federal habeas when reviewing state proceedings. 529 U.S. 362, 389 (2000) (interpreting § 2254(d)(1) as mandating "federal courts to attend to every state-court judgment with utmost care."). Congress's explicit aim was to limit the ability of federal courts to undermine state court decisions, absent an obvious constitutional error. Where a state court has ruled on an issue, a habeas petitioner is required to "show that the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

To the extent Respondent believes that existing law precludes any constitutional challenge to the denial of a continuance, this court disagrees. The Supreme Court has repeatedly protected the general right to procedural due process of law; that is, "the fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914). The denial of time to present witnesses could, under some circumstances, amount to a denial of the opportunity to be heard. The Court has in fact ruled that unreasonable denials of a continuance can violate a defendant's Sixth Amendment rights: "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel. *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 (1983) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). The Court has acknowledged that denial of a continuance can violate due process as well, explaining that while no mechanical test exists to determine if there was a due process violation, "the answer must be found in the circumstances present in every case." *Ungar*, 376 U.S. at 589. More recently, the Court vacated the denial of a habeas petition where the state court had relied on onerous procedural rules to deny a continuance motion. The Court observed that "[i]nsistence on a written continuance application, supported by an affidavit, in the midst of trial upon the discovery that subpoenaed witnesses are suddenly absent, would be so bizarre as to inject an Alice-in-Wonderland quality into the proceedings." *Lee v. Kemna*, 534 U.S. 362, 383 (2002) (citations omitted). This court concludes that the Supreme Court has established the general principle that denial of continuances, in some circumstances, can violate due process.

The Seventh Circuit has so held, interpreting Supreme Court precedent for the proposition that "[t]he Fourteenth Amendment's Due Process Clause also bars a court from denying a defendant's motion for a continuance arbitrarily or unreasonably." *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008) (citing *Ungar*, 376 U.S. at 589). *Cf. Baranauskas v. Holder*, 396 F. App'x

315, 317 (7th Cir. 2010) ("To establish that the IJ's refusal to grant a continuance or substitute counsel violated his right to due process, Baranauskas needed to demonstrate that the decision likely affected the result of the proceedings.") (citations omitted).

The rule announced in *Ungar* itself was broad and inclusive: "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." 376 U.S. at 589.[10] Petitioner sought a continuance in order to call three additional witnesses (two of them at issue in this motion). (*See* Direct Appeal Order at 7.) The first, Vertin, was to testify that during a prior incident, the victim told him that Petitioner stored a bag of clothing at her home. (*Id.*) The second, Ward, was to testify that the Petitioner and victim knew one another for many years, and had both a dating and sexual relationship. (*Id.*) The trial court denied the continuance, concluding that Vertin's testimony was collateral to the defense of consent, and that with respect to Ward, Petitioner was not entitled to a continuance because he had not been diligent in presenting her earlier. (Report of Proceedings at 1019-25.) The Illinois Appellate court noted, further, that Ward's testimony would merely duplicate that of Simpson and Williams, in that it would demonstrate that the Petitioner and victim and a prior dating relationship, and would not speak to consent. (Direct Appeal Order at 9.) This court cannot conclude that this determination was an unreasonable application of clearly established law.

The charges against Petitioner had been pending for more than two years, and Petitioner did not mention the possibility of calling Ward as a witness until the last day of trial. The right of a defendant to call witnesses does, at some point, yield to judicial efficiency. *See, e.g.*, *United States v. Sinclair*, 770 F.3d 1148, 1156 (7th Cir. 2014) (finding no abuse of discretion in denying

---

[10]     Note that Respondent's sole support for the contention that this claim is barred by § 2254(d)(1) is a case from the Eleventh Circuit (Response at 4-5), in which that court stated that "Because *Ungar* did not consider whether the denial of a motion for continuance to secure an alibi witness constituted a due process violation, it arguably does not constitute clearly established federal law." *Himes v. Sec'y, Fla. Dep't of Corr.*, 690 F. App'x 640, 646 (11th Cir. 2017). This court believes the safer conclusion is that it does.

a continuance, and citing "costs of a last-minute adjournment to the government, the witnesses, and the fair and efficient administration of justice" as relevant factors to consider). To grant last-minute requests for continuance in every case would obviously be unworkable.

In this case, it is not clear that the court's decision prejudiced the defense, as the evidence Petitioner hoped to elicit appears to be barred by the Rape Shield law. Ward would only have been allowed to testify as to a dating relationship between Petitioner and the victim—a relationship that two witnesses had already confirmed at trial. In a case of alleged sexual assault, the Rape Shield law bars evidence of "the prior sexual activity or the reputation of the victim." 725 ILCS 5/115-7. Thus, had Ward been called to the stand, she could only have testified about matters already presented through other witnesses.

With respect to Vertin, the trial court's denial of a continuance was again well within its discretion. As the state courts observed, Vertin's proposed testimony was collateral to the Petitioner's defense of consent. (Direct Appeal Order at 9; Report of Proceedings at 1021.) Testimony that Petitioner left a bag of clothing at the victim's house in 2008 would shed no light on consent at the time of the incident in question, and would serve simply to impeach the victim on an unrelated matter. *See, e.g., Tague v. Richards*, 3 F.3d 1133, 1138 (7th Cir. 1993) ("The trial court has great latitude to exclude collateral information because the witness' general credibility may normally be attacked with other information.").

This court concludes that the testimony of each of the proposed witnesses would have been, at best, minimally beneficial to the Petitioner and that the trial court correctly noted Petitioner's lack of diligence in making the eleventh-hour request for additional time. Testimony confirming that the victim had dated Petitioner, or had been sexually active with him, provides no real support for the notion that she consented to being penetrated with a baseball bat. Denial of a continuance in these circumstances was neither arbitrary nor unreasonable and did not violate due process under the standards recognized in *Ungar,* 376 U.S. at 589. Accordingly, Claim Ten is denied.

### K.      Claim Eleven: Denial of Ability to Confront Victim on Sexual History

Last, Petitioner claims his Confrontation Clause rights were violated when he was barred from questioning the victim concerning her sexual history.  (Habeas Pet. at 32.)  Respondent again argues that this claim is barred under § 2254(d)(1), as "the Court has never held that a defendant has a right to admit the victim's sexual history at a rape trial."  (Response at 4.)  Again, this court believes Respondent's interpretation is overly narrow.  In a case that Respondent itself cites, the Supreme Court held that "[r]estrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence may not be arbitrary or disproportionate to the purposes they are designed to serve."  *Michigan v. Lucas*, 500 U.S. 145, 151 (1991) (citation omitted).  Significantly, this statement was in the context of weighing a defendant's confrontation rights against "precluding evidence of a prior sexual relationship between a rape victim and a criminal defendant."  *Id.* at 151.  The Seventh Circuit has also recently stated that there are "clearly established Supreme Court precedents recognizing the right of the accused to cross-examine witnesses on issues central to the case."  *Rhodes v. Dittmann*, No. 17-2223, __ F.3d __, 2018 WL 4290735, at *6 (7th Cir. Sept. 10, 2018).  In *Rhodes*, the habeas petitioner had been convicted of murdering an individual who had beaten the petitioner's sister.  The trial court had prohibited the petitioner from cross-examining the sister about her injuries, despite the fact that the state's primary theory was that those injuries were the motive for murder.  *Id.* at *1.  Reversing the denial of habeas relief, the Seventh Circuit found this evidentiary ruling violated the petitioner's Confrontation Clause rights.  At a minimum, this court concludes that the Supreme Court has established that any Confrontation Clause restrictions must be sensible and proportionate.

Petitioner claims that the court's order prohibiting questions about the victim's sexual history violated that principle.  In particular, Petitioner challenges what he understands as a "mid-trial shift" in the wording of the restriction.  (Pet.'s Dir. Appeal Br. at 2; Habeas Pet. at 32.)  He also appears to contend that the Rape Shield law itself is "arbitrary or disproportionate to the purposes [it is] designed to serve."  *Lucas*, 500 U.S. at 151.

In assessing the trial court's rulings on § 2554 review, the court is "highly deferential" to the state court's determinations, *Lindh*, 521 U.S. at 333 n.7, and gives those rulings the "benefit of the doubt." *Woodford*, 537 U.S. at 24. The trial court in Petitioner's case was enforcing the Illinois Rape Shield law, 725 ILCS 5/115-7. Under that law, "reasonably specific information as to the date, time and place of the past sexual conduct between the alleged victim" must be offered before a party may "inquir[e] into prior sexual activity" of the victim." At a pretrial hearing to determine whether that showing could be made, Petitioner was unable to identify any precise dates, though he claimed to have had intercourse with the victim more than 100 times. (Report of Proceedings at 209-281; Direct Appeal Order at 10.) He offered no other corroboration, and the trial court did not find "sufficiently reasonable information" to support an exception from the Rape Shield law's limitations. (Report of Proceedings at 279-280.) The court ruled, however, that the issue could be reopened if the victim were to admit to "prior sexual conduct." (*Id.* at 280.)

Then, at a subsequent hearing, Petitioner offered the testimony of two witnesses to corroborate his claim of past sexual contact between himself and the victim. (Direct Appeal Order at 10-11.) Following this hearing, the trial judge ruled, "the court will allow defense counsel and the defendant to present before the jury that defendant and the victim had a prior dating relationship. There will be no evidence presented . . . to the extent of any sexual relationship between . . . the defendant and victim." (Report of Proceedings at 370.) The judge did, however, allow the defense to present evidence that "this date of sexual relations . . . between the defendant and the victim was not the sole time." (*Id.*)

At trial, however, the court expressed its ruling differently. During a side bar at the conclusion of the victim's direct examination, the trial court ruled that before asking any questions about the victim's sexual activity with Petitioner, defense counsel was required to elicit her testimony acknowledging that there had been a *dating* relationship between the two of them. (*Id.* at 647.) If she denied such a relationship, the judge directed, there could be no further inquiry concerning any previous sexual contact with Petitioner. (*Id.*) Thus, when the victim denied having

been in a dating relationship with Petitioner, he was barred from questioning her about their sexual history.

In assessing the claim that this ruling violated Petitioner's rights, the court notes that the facts in this case differ significantly from those in *Rhodes*. In that case, the state court prohibited cross-examination on the "central theory about why Rhodes would have murdered the victim." *Rhodes*, 2018 WL 4290735 at *1. Petitioner's primary defense was that the victim consented to the acts in question. Though he was barred from asking questions about prior sexual activity between them, he remained free to question her about her consent to the acts on the night of the alleged assault. The trial court emphasized this, pointing out that "the victim may be obviously cross-examined as to the issue of consent as to that day." (Report of Proceedings at 280.)

This court recognizes a potential confusion arising from the trial judge's rulings. The court's ruling at trial prohibited defense counsel from asking any questions about whether "she ever had a sexual relationship with the defendant" unless she first acknowledged a dating relationship. (Report of Proceedings at 647.) But in a pretrial hearing, the judge ruled that Petitioner was entitled to show the jury that the April 15, 2009 encounter was not "the sole time" the two had engaged in sexual contact, even without any initial mention of a "dating" relationship. (*Id.* at 370.) Giving appropriate deference to the state court's determinations, it appears that the trial judge effectively prohibited defense counsel from questioning the *victim* as to prior sexual contact, but permitted Petitioner to make a showing through the testimony of other witnesses or evidence. The inconsistency between the pretrial ruling and the ruling at trial is nevertheless awkward. In affirming the conviction on direct appeal, the Illinois Appellate court approved the order adopted pretrial: precluding questions of the victim concerning her sexual history with Petitioner unless she first admitted "prior *sexual* contact." (*See* Direct Appeal Order at 10-11; Report of Proceedings at 280) (emphasis added). As noted, at trial, the judge instead required that the victim first admit to a dating history with Petitioner before she could be asked whether this dating relationship included sex. (Report of Proceedings at 647.) That is, the judge appeared

to understand dating as a necessary prerequisite for a sexual relationship—an assumption that, however appealing, may not be a valid one in a culture of more casual sex. The victim might well have answered honestly that she had no "dating" relationship with Petitioner even if she also admitted having had a sexual relationship with him.

To the extent the court mischaracterized its own prior order, however, this court concludes any error was harmless. Had defense counsel successfully elicited an admission from the victim that there had been a prior sexual relationship between herself and Petitioner, the trial judge's order would have required an additional conference before she could be asked further questions. (Report of Proceedings at 280.) In the best possible case for Petitioner, the judge would have allowed him to ask additional questions regarding her sexual history. But her answers to these questions would not obviously bolster Petitioner's primary defense: that the parties were engaged in consensual sex on the night of the alleged attack. Such a defense faced a steep uphill battle in the face of the evidence that the victim claimed to have lost consciousness following the encounter; that she called police and was transported to a hospital when she awoke; that a medical technician detected tenderness in her cervix, rectum, and left temple; and that he diagnosed a closed head injury and rectal injury, and terminated the examination due to bleeding. A CT scan confirmed her account that Petitioner inserted a baseball bat into her rectum—hardly a circumstance consistent with consent. (Direct Appeal Order at 5-6; Report of Proceedings at 665-66, 760-65.)

Petitioner might conceivably argue that, the trial judge's rulings aside, the Rape Shield law is itself an unconstitutional bar on Petitioner's Confrontation Clause rights. As noted, restrictions on cross-examination "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Lucas*, 500 U.S. at 151. As *Lucas* itself acknowledged, however, Rape Shield laws can serve a proper state interest. *Id.* at 152-53 ("The notice-and-hearing requirement [of a Rape Shield law] serves legitimate state interests in protecting against surprise, harassment, and undue delay."). Although the limitations imposed by those laws must be balanced against the

rights of the accused, such laws have withstood constitutional challenge in the Seventh Circuit. *See, e.g., Sarfraz v. Smith*, 885 F.3d 1029, 1037 (7th Cir. 2018) (following sexual assault conviction, affirming dismissal of a habeas petition where the state court barred evidence of petitioner's prior consensual sexual contact with his victim under Wisconsin's rape shield law); *Hammer v. Karlen*, 342 F.3d 807, 812 (7th Cir. 2003) (affirming denial of habeas petition, and noting that Confrontation Clause rights were "outweighed by the state's interest in protecting the privacy of sexual assault victims" when the sought-after testimony was not "highly relevant."); *Pack v. Page*, 147 F.3d 586, 589 (7th Cir. 1998)("Indeed, the Supreme Court has yet to hold that any application of a rape-shield statute is inconsistent with the Constitution.") Petitioner has not demonstrated why any balancing of his right to present a consent defense in this case would overcome the clearly established interests of the state and of sexual assault victims.

Claim Eleven is denied.

## CONCLUSION

Amos's petition for relief pursuant to 28 U.S.C. § 2254 [1] is denied. The court will enter judgment in favor of Defendant.

With respect to all but one of Petitioner's claims, the court concludes that no reasonable jurists would debate this court's resolution. The single exception is Claim Eleven. The court concludes that reasonable jurists might conclude that the trial court's inconsistency in the limitations imposed on cross-examination of the victim violated Petitioner's rights to confront his accuser. On this single issue, a Certificate of Appealability will issue. As this case was resolved without the need for an evidentiary hearing, Petitioner's motions to testify [20, 24] and for issuance of subpoenas [21, 22, 23] are stricken as moot.

ENTER:

*Rebecca R. Pallmeyer*

Date:  September 24, 2018

_____
REBECCA R. PALLMEYER
United States District Judge